# Exhibit C

Transcript of Hearing on Plaintiffs' Emergency
Motion for Temporary Restraining Order

April 15, 2025

```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN
 2                            SOUTHERN DIVISION

 3

 4    CHINMAY DEORE, et al,

 5              Plaintiffs,

 6    -v-                                    Case No. 25-cv-11038

 7    UNITED STATES DEPARTMENT
      OF HOMELAND SECURITY, et al,
 8
                Defendants.
 9    _____/

10

11        HEARING ON PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY
              RESTRAINING ORDER AND PRELIMINARY INJUNCTION
12
               BEFORE THE HONORABLE STEPHEN J. MURPHY
13
             Detroit, Michigan, Tuesday, April 15th, 2025.
14

15

16    APPEARANCES:

17    FOR THE PLAINTIFFS:        RAMIS JAMAL WADOOD
                                 DANIEL S. KOROBKIN
18                               ACLU Fund of Michigan
                                 2966 Woodward Avenue
19                               Detroit, MI 48201

20
      FOR THE PLAINTIFFS:        KEVIN MICHAEL CARLSON
21                               Pitt, McGehee, Palmer & Rivers, P.C.
                                 117 West Fourth Street
22                               Suite 200
                                 Royal Oak, MI  48067
23

24

25
```

```
 1    (Appearances, continued):

 2
      FOR THE DEFENDANTS:        ZAK TOOMEY
 3                               United States Attorney's Office
                                 231 West Fort Street
 4                               Room 2001
                                 Detroit, MI  48226
 5

 6

 7
      David B. Yarbrough, CSR, RMR, FCRR
 8    Official Court Reporter
      (313) 234-2619
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE




EXHIBITS

NONE

1          Detroit, Michigan.

2          Tuesday, April 15th, 2025.

3          At or about 10:13 a.m.

4                    --    ---    --

5          THE CLERK OF THE COURT:  All rise.  The United States

6     District Court for the Eastern District of Michigan is now in

7     session, the Honorable Steven J. Murphy, III presiding.  Please

8     be seated.

9          The Court now calls case number 25-cv-1138, Chinmay

10    Deore, et al v. Secretary of US Department of Homeland

11    Security, et al.  This is the date and time set for oral

12    argument on the emergency motion for temporary restraining

13    order.  Counsel, please state you're appearances for the record

14    beginning with the plaintiff.

15         MR. WADOOD:  Good morning, your Honor.  This is Ramis

16    Wadood on behalf of all plaintiffs.

17         MR. KOROBKIN:  Good morning, your Honor.  Daniel

18    Korobkin on behalf of the plaintiffs.

19         MR. CARLSON:  Good morning, your Honor.  Kevin

20    Carlson for plaintiffs.

21         THE COURT:  Welcome.

22         MR. TOOMEY:  Zak Toomey on behalf of the defendants,

23    your Honor.

24         THE COURT:  Okay, welcome.  Good morning.  Thank you

25    all for being on time.  Sorry for being a little bit late.

| | |
|---|---|
| 1 | It's 10:15 which is fine because we put aside about 45 minutes |
| 2 | for this and Mr. Abrutyn, is that the correct pronunciation? |
| 3 | MR. WADOOD:  My name is Ramis Wadood, last name |
| 4 | Wadood.  Mr. Abrutyn couldn't make it today. |
| 5 | THE COURT:  Hold on a minute, let me just make sure I |
| 6 | have this.  I saw your name.  Okay, Mr. Wadood, I apologize for |
| 7 | that.  Okay, so we're hear from him in a second for about 15 |
| 8 | minutes, then we're hear from Mr. Toomey for about 15 minutes |
| 9 | and then we'll let Mr. Wadood close things out and we'll see |
| 10 | where we go from here, but this is of course a matter involving |
| 11 | four international students; two at the University of Michigan, |
| 12 | two at Wayne State who received notice through their |
| 13 | universities that their F-1 immigration status had been |
| 14 | terminated by Homeland Security.  The matter of whether or not, |
| 15 | umm -- my understanding of the way this works is that all four |
| 16 | legally entered the United States on visas, F-1 visas.  Once as |
| 17 | I understand it an individual enters the United States pursuant |
| 18 | to a visa, they have status.  The visa at that point is really |
| 19 | not material whether it expires or not, the question is whether |
| 20 | or not the status changes and as long as a person stays in the |
| 21 | United States without a status change and they don't commit |
| 22 | crimes or engage in any behavior that would, umm, that would |
| 23 | change their status, then they are okay.  My understanding here |
| 24 | is that the legal status did change without their knowledge and |
| 25 | not withstanding their law-abiding and overall non-problematic |

6

1   nature as students, they had their SEVIS record terminated and

2   therefore are subject to mediate removal, so that's why we're

3   having a hearing on a motion, an emergency TRO.

4        Mr. Toomey responded yesterday prior to 6 p.m. and if

5   I'm reading his brief correctly, I believe he says no one is

6   arguing on either side of the courtroom that the status has

7   changed, but that the visas have been revoked prudentially and

8   the SEVIS status was merely modified to reflect that the visas

9   had been revoked, but again to me once a visa permits you to

10  enter the country and you have status, I'm not sure that the

11  visa matters anymore.

12        I also believe Mr. Toomey's position is that criminal

13  record searches only showed encounters between the plaintiffs

14  and local law enforcement or Customs and Border Patrol

15  presumably when they entered or reentered, so the government I

16  believe, but we'll hear more, is going to say that the

17  likelihood of any removal is very low and would at the minimum

18  support fuller briefing on an PI motion which has been filed by

19  the plaintiffs and not need emergency, immediate relief in the

20  form of a TRO.  So that's where I'm at on it just so you know,

21  with that background, you're free to say whatever you want.

22  Mr. Wadood, come on up to the mic and you can get started.

23        MR. WADOOD:  Thank you, your Honor.  Like I

24  mentioned, my name is Ramis Wadood.  I'm here on behalf of four

25  international students who study at Wayne State University and

1    the University of Michigan.  They came here through the F-1

2    international student program which for decades has allowed

3    thousands of foreign-born non-citizen students to come to the

4    U.S. and complete their studies at American universities and

5    that's what they've been doing for the last few years.  They

6    have been singularly focused on completing their degrees at the

7    University of Michigan and at Wayne State University.  They

8    have followed all of the many rules imposed on individuals with

9    F-1 student status and yet over the last week and-a-half they

10   have woken up to notices not from the government, but from

11   their schools notifying them that their F-1 student status has

12   been terminated and that they are required to leave the country

13   immediately.  This obviously plunged plaintiffs' lives into

14   chaos.  They were forced to cease work.  They didn't know if

15   they could attend classes.  They couldn't apply for new

16   academic programs in the U.S. and now as they're packing their

17   bags, they have also filed this lawsuit arguing that the

18   sudden, abrupt and arbitrary termination of their F-1 student

19   status violates the due process clause and the Administrative

20   Procedure Act.

21            THE COURT:  Okay, brief interruption, make sure I'm

22   correct on this because in my opening statement I'm not sure

23   that I was.  There's no question that the F-1 visas have been

24   revoked.  It appears that what they learned from their

25   university was that in the course of the revocation of those

1  visas, quote "Homeland Security presumably must have told the

2  universities" the reason for the revocation was quote

3  "otherwise failure to maintain status, individual identified in

4  criminal records checked and/or has their visa revoked, SEVIS

5  record has been terminated."  Does that work as or constitute

6  an actual termination or change of their status?  I think

7  that's important for me to know.

8          MR. WADOOD:  It does not, your Honor.  A criminal

9  record check, in the first instance I'll say that none of our

10  plaintiffs have been charged with or convicted of a crime and

11  so all that would show up in --

12          THE COURT:  No protests, no arrests, no convictions,

13  singularly focused on studying?

14          MR. WADOOD:  So there have been some an arrests that

15  have not like charges at all for any of our plaintiffs, but as

16  far as their actual criminal record go, it's completely clean

17  besides a speeding ticket or a parking ticket here or there, so

18  I'll say that at the first instance.  Second of all, an arrest

19  or the revocation of a visa is not a valid basis for the agency

20  to initiate a termination of F-1 student status.  There is a

21  very clear federal regulation, 8CFR, 214.1, subsection D that

22  outlines three reasons, three ways the agency can initiate a

23  termination of someone's status.  Now that is a

24  nondiscretionary federal regulation that the Third Circuit in

25  the Jie Fang case that we cite throughout our motion has

1    recognized places a limit on the agency as far as when and how

2    they can initiate the termination of someone's status and a

3    criminal records check, whether it's an arrest or nothing at

4    all or the revocation of a visa is not one of those bases for

5    terminating status and so students in this case are left with,

6    you know, a boiler plate reason from the government as to why

7    their status was terminated except when you look at the law,

8    when you look at the regulation that governs this program, they

9    find that that's not a valid reason and that underpins our

10   Administrative Procedural Act claim that this was not in

11   accordance with law, that this was arbitrary and capricious and

12   the fact that they weren't notified as a violation of the due

13   process clause also underpins the fact that this was an agency

14   action taken contrary to a Constitutional right.

15          THE COURT:  I've been more focused on the APA

16   arguments.  Did you speak to this morning Chamber of Commerce

17   of the United States v. S.E.C. which was 115 F4th, 740?  I

18   don't know if you in your argument did you mention that?

19          MR. WADOOD:  No, your Honor.

20          THE COURT:  All right.  That stands for the fact or

21   the proposition that as you know agencies have to articulate

22   satisfactory answers including a rational connection between

23   the facts that the agency found and the choices that were made.

24   I don't know that there is been any reasoning given and there's

25   certainly no evidence for the decision that your clients

1   received from the agency since it was funneled down through the

2   universities.  Correct?

3          MR. WADOOD:  This is actually a case we cited, but

4   didn't develop for the proposition that the general State Farm

5   standard is still active and applies in the Sixth Circuit and

6   that's exactly right, your Honor.  There was no rational basis,

7   no reasoned explanation for the termination of their F-1

8   status.  In the first instance, again the students weren't even

9   notified by the government that their status was terminated,

10  the government didn't even notify the school.  The school does

11  a periodic check of the database that tracks F-1 student status

12  and only learned during that periodic check that the statuses

13  were terminated after which they notified the students, but

14  you're right, your Honor.  The terminations themselves, the

15  entry in the database listed that boiler plate language you

16  quoted which was otherwise failing to maintain status, criminal

17  records check and/or visa was revoked, but there was no

18  evidence, no explanation and again both of those circumstances,

19  the criminal records check and the revocation of a visa, not

20  only do they not describe some of our plaintiffs, but they

21  don't form a lawful basis for the termination of status and I

22  want to point to one of our plaintiffs as an example which is

23  Chinmay Deore.  He has never even gotten an F-1 visa.  He came

24  to the U.S. a decade-plus ago on an H-4 visa which is the

25  dependent of someone who has been granted an H-1-V visa.  As he

1    grew older, he changed to F-1 status while already in the

2    United States and so the government never even issued him an

3    F-1 visa because he didn't need to enter the U.S., he was

4    already here and so there was no visa for the government to

5    revoke in that circumstance and so the and/or visa was revoked

6    clearly doesn't apply to him and even if it did, again it's not

7    a lawful basis for the termination of status.

8           On the flip side, the criminal records check, again

9    your Honor none of our plaintiffs including Chinmay has been

10   charged with or convicted of a crime.  There are obviously

11   certain deportability grounds for crimes of violence,

12   aggravated felonies and that's incorporated to some extent in

13   maintaining F-1 status, but again none of our plaintiffs have

14   committed, been charged with, convicted of a crime of violence,

15   let alone any crime.

16          THE COURT:  All right.

17          MR. WADOOD:  And so we're left wondering your Honor

18   why these plaintiffs' F-1 statuses were terminated.  Clearly

19   the reason given through the F-1 student status database called

20   SEVIS doesn't fully explain or even reasonably explain why

21   their status was terminated and so that's why today plaintiffs

22   are seeking a temporary restraining order to settle the dust on

23   this chaos so that this Court can fully and comfortably

24   consider plaintiffs' claims on the regular course of

25   litigation.

```
 1              THE COURT:  All right.  Okay, so I understand all
 2    that and I also frankly would like to know myself why all this
 3    happened, but we'll get there I'm sure.  What I have to ask you
 4    as a practical matter based on Mr. Toomey's response especially
 5    starting on page 12 where he talks about likelihood of success
 6    on the merits and the harm that would come to them under the
 7    APA prong and failure to review.  It seems to me like what he's
 8    saying is that this isn't final yet.  Like you, I think
 9    Mr. Toomey believes that he has some facts to gather and figure
10    out what's going on here and that the likelihood that your
11    clients would be deported any time soon or that there would be
12    a number of other horrible outcomes is highly unlikely and
13    we'll hear from him on that, but as a very practical matter it
14    seems to me you have valid claims, you have serious interests,
15    you have, you know, a number alleged harms, but would we not be
16    better off denying the extraordinary relief that you ask for
17    because it may or may not -- may not be supported by law and
18    just get a preliminary injunction schedule in place here, get
19    full briefing, maybe evidence from the United States as needed
20    and then we can handle this in a more reasoned, less rushed and
21    more thoughtful manner?
22              MR. WADOOD:  Yes, your Honor.  I'll --
23              THE COURT:  I'm sure you expected that question.
24              MR. WADOOD:  I'll start with the last piece about
25    emergency relief and I agree with you totally a more fulsome
```

1    record, more briefing would be beneficial for this Court, but

2    that's exactly why we're seeking a temporary restraining order

3    that until briefing is complete, until the record is

4    established, our plaintiffs can feel safe and sound that they

5    can remain in the U.S.  Like I said in my opening, your Honor,

6    our plaintiffs are currently packing their bags.  Their schools

7    are telling them they have to leave the country immediately,

8    that there is no grace period.  This is fairly unprecedented

9    and so we don't have that many examples from the past, but I

10   will point you to the Jie Fang case from the Third Circuit that

11   we cite again throughout our motion.  Exact same circumstance

12   where students learned that their entry and SEVIS and SEVIS

13   database that their status was terminated.  Those students were

14   put in removal proceedings and so to this day for the last week

15   and-a-half, our plaintiffs are afraid that they will be

16   arrested, detained, initiate -- that removal proceedings will

17   be initiated against them with no recourse and as to the

18   recourse, I'll go back to your question about this being a

19   final agency action.  I think you're right that that's what the

20   government is arguing, that this is not a final agency action,

21   but that argument was rejected by the Third Circuit in the

22   Jie Fang case for very specific reasons that there's no way for

23   plaintiffs to challenge, to seek review from a superior agency

24   of their student status termination.

25            THE COURT:  Mr. -- I'm sorry to interrupt, I

1    apologize.  Mr. Toomey says that Jie Fang is not applicable

2    here.  According to him, that was a Third Circuit case and if

3    it's right on point, I would certainly consider that as

4    persuasive, but Mr. Toomey says that Jie Fang didn't deal with

5    the termination of a SEVIS record, it was the revocation of

6    status and that makes the two cases, this one and Jie Fang

7    inconsistent with each other.  I don't know if you had a chance

8    to look at that, but --

9            MR. WADOOD:  Right, your Honor.  I will quote what

10   the government said in the Jie Fang case which the letter that

11   the students received is quoted in the Jie Fang case and it

12   says this letter is to inform you that your SEVIS record and

13   your form I20, dot, dot, dot, has been set to terminated status

14   due to your fraudulent enroll then in above school.  Since your

15   SEVIS record has been terminated, you no longer have valid F-1

16   non-immigrant status and must either file for reinstatement or

17   depart the United States immediately.  That is exactly what is

18   happening here your Honor and so the same government action

19   that led to the Jie Fang decision is the same government action

20   that is happening here.  Obviously there are some factual

21   differences that dealt with a sting operation, a fraudulent

22   school that DHS created and this situation is different

23   factually, but the government action is the same which is the

24   termination of student status which is then reflected in the

25   database, SEVIS, the database that tracks the status of F-1,

1    M-1 and J-1 international students and so we think the Jie Fang

2    case from the Third Circuit directly applies here.

3         THE COURT:  Okay, good.  Anything else?

4         MR. WADOOD:  I'll just say, your Honor, again that

5    this is temporary relief until the Court can fully consider the

6    plaintiffs' claims.  I will emphasize once again our plaintiffs

7    are packing their bags with no direction from the government.

8    I'd ask --

9         THE COURT:  I'm sorry, I did want to ask are they

10   de-enrolled now?  What happens in they show up on campus and

11   try to go to class?  Does the school say you're done here or

12   what's that?

13        MR. WADOOD:  The plaintiffs are currently speaking

14   with their program advisors and directors to see if they can

15   still attend classes remotely, if they can still obtain their

16   degrees.  Again, this is fairly unprecedented and not even the

17   schools have information as to what the government is doing

18   here and so, for lack of better words, they're also trying to

19   figure it out.  For now, students are, umm, at the very least

20   the students who have been authorized to work in connection

21   with the programs, the schools is not allowing them to continue

22   working.  Their paychecks have been cut off; their primary

23   source of income has been cut off.  The students who are trying

24   to transition into a graduate program or a PhD are now finding

25   it hard to convince the schools that they're able to easily

1   transfer their F-1 status to a new school and so again there's

2   a lot of chaos, a lot of trying to figure out what is going on,

3   a lot of already irreparable harm as far as the termination of

4   authorized work goes which is why, again, this is a temporary

5   restraining order to essentially restore the students' statuses

6   until we can get to a full preliminary injunction briefing and

7   onwards so that they can proverbially unpack their bags,

8   continue to attend classes, fulfill their degree requirements,

9   maintain their F-1 status through maintaining a full course of

10  study while we the lawyers are in court to settle the chaos and

11  the mess.

12          THE COURT:  All right, good.  Well done.  Thank you

13  very much.  That's a very helpful and I know Mr. Toomey will be

14  very helpful as well.  Welcome, sir.

15          MR. TOOMEY:  Good morning, your Honor.  I'd like to

16  start with the procedural.  We're here on an emergency Rule 65

17  motion for a temporary restraining order.  The Court should

18  confine its consideration to the record before the Court which

19  at this point is very slim and should also keep in mind that

20  the purpose of a temporary restraining order is to maintain the

21  status quo.

22          Now let's examine the relief they're seeking on this

23  temporary restraining order.  Prior this suit, the Department

24  of Homeland Security at the behest of the Department of State

25  terminated plaintiffs' SEVIS records.  That is the status quo.

1    On their temporary restraining order, they are asking the Court

2    to reverse that decision and upset the status quo which would

3    be an affirmative preliminary injunction that the Court should

4    not award without a fuller record.

5            THE COURT:  I agree with that, but procedurally and

6    I'm not sure I even need to do this based on something else I

7    want to talk to you about, but procedurally I could just simply

8    enter an order preserving the status quo and saying we need to

9    figure some of these things out and do not remove these

10   individuals.  I could do that, couldn't I?

11           MR. TOOMEY:  Not in this particular case because

12   there's no likelihood that there's an imminent removal so

13   that's no case or controversy about their removal.

14           THE COURT:  That's what I wanted to talk to you

15   about.  So I guess two things, one of which I finished with

16   Mr. Wadood recently before he sat down, as long as we're

17   litigating, is the government taking the position on the record

18   before it now that the plaintiffs will return their F-1 status,

19   legal F-1 status as long as they remain in the country here and

20   I think why I ask that is it because if I read your brief

21   correctly, you said that the revocation of the visas were

22   prudential and so if that means there's not going to be an

23   immediate deportation, then I have to I think -- well, separate

24   question.  What's your answer to that?

25           MR. TOOMEY:  Umm, it's more or less correct.  So at

1   the beginning the hearing, your Honor sort of characterized

2   that role of the visa versus status versus SEVIS and so I'll do

3   that now.  A visa does allow a student, a nonimmigrant student

4   to enter.  It can be related to status.  If the Department of

5   State immediately revokes a visa, the student immediately

6   becomes removable, so the visa can affect status, but it

7   doesn't always affect -- reflect status.

8           THE COURT:  How does that work?  I thought if you

9   come in on a visa and you achieve status, the visa may expire

10  and you retain your status, right?

11          MR. TOOMEY:  So under Eight U.S.C., 1201(i), Congress

12  has granted the Department of State discretion to revoke a visa

13  at any time and when that happens, when it is an immediate

14  revocation of that nature, it makes the noncitizen removal I

15  think immediately under Eight U.S.C., 1220(c) -- 1227.  So the

16  visa sometimes affect status.  In this case though, we're not

17  arguing that it does.  We believe that the State Department's

18  revocation was prudential.  This is described best in a

19  document provided to the Court by plaintiffs themselves.  It's

20  at ECF number 2-3, page ID number 92 and 93 and it explains

21  roughly what happened in this case although it's a 2010

22  document so this is a policy that's been applied for 15 years

23  and over the course of many presidents.  It says the Department

24  of State received a continuous stream of information that

25  affects the eligibility of aliens to hold visas.  Now as it

1    collects that information if receives information of sufficient

2    severity, the Department of State revokes the visa promptly and

3    relies on the visa application process to resolve identity and

4    other questions at a later time should the visa holder wish to

5    reapply for a visa.  That's explaining the prudential

6    revocation process meaning that the revocation when it's

7    prudential revocation, it only takes affect once the student

8    leaves the country and when they reapply for a new visa, they

9    have to confront this adversarial information, the criminal

10   history of plaintiffs in this case.

11        THE COURT:  So your position here is what has

12   happened here is a prudential revocation and as such, as long

13   as the students, student plaintiffs don't leave the country or

14   presumably, you know, suffer a conviction or something like

15   that which I think is highly unlikely, then they're not going

16   to get removed?

17        MR. TOOMEY:  That's correct.  So the Department of

18   Homeland Security and the declaration that we provided, we

19   provided the information that we possess about the plaintiffs

20   in this case.  None of them are in removal proceedings and as

21   far as we know none of them have done anything that would

22   affect their nonimmigrant status at this time, but we do know

23   that the F-1 visa for two of them has been revoked, but that

24   alone if it's a prudential revocation which we understand

25   that's what this is does not affect their status.  Now the

1    important thing in the case is the distinction between the

2    nonimmigrant student's status and the SEVIS record.  They are

3    not --

4            THE COURT:  Well, let me -- okay, go ahead.  Finish

5    that off and then I have a question.  Go right ahead.  I'm

6    sorry to interrupt you.  Go ahead.

7            MR. TOOMEY:  I'm happy to answer your --

8            THE COURT:  No, no, no.  I want to hear what you have

9    to say because it's important and I have something else on my

10   mind.  Go ahead.

11           MR. TOOMEY:  SEVIS is a database run by the student

12   and visa exchange program.  It's a Department of Homeland

13   Security database.  It was created in the wake of September

14   11th where Congress challenged the national security apparatus

15   to keep track after noncitizens to make sure that another

16   terrorist attack like that never, ever occurred.  It is a

17   database controlled and maintained by the Department of

18   Homeland Security for national security reasons and to

19   facilitate the F-1 visa status and also visitor exchange status

20   and other circumstances.  It's a database.  It doesn't control

21   nonimmigrant status.  Nonimmigrant status for an F-1 student is

22   controlled by the regulations at 214.2(f).  It just is a

23   recordkeeping database for the government and it doesn't

24   necessarily -- well, it doesn't control status at all and

25   that's in the declaration from the Department of Homeland

1    Security and it doesn't necessarily reflect status because

2    SEVIS records can be terminated for reasons that don't affect

3    status as in this case.  A criminal history hit does not affect

4    status, but it is a reason for terminating a SEVIS record and

5    the government attached, there's a whole list of reasons if you

6    look at 14- umm, this is just an example, but 14-3 -- or sorry,

7    14-4 there's a whole chart of reasons that a SEVIS record may

8    be terminated, one of which is authorized drop below full

9    course time exceeded.  So an authorized drop below course-load

10   would not affect status, but it is a reason for terminating a

11   SEVIS record under certain circumstances.  Nonimmigrant status

12   and a SEVIS record are different legal concepts and where

13   Department of Homeland Security is not taking the position that

14   the plaintiffs have lost nonimmigrant status because we don't

15   have the information that make that determination.

16           The only evidence in the record that someone believes

17   that these students have lost status is in the plaintiffs'

18   complaint it.  It's the e-mails from the University of Michigan

19   which written to plaintiff Yang says it repeats the SEVIS

20   record termination and then it goes on to say we do not have

21   any additional information, but this termination means you no

22   longer hold valid F-1 status within the United States.  The

23   Department of Homeland Security --

24           THE COURT:  Well, isn't that, that's not quoted

25   language from the Department?

1        MR. TOOMEY:  No, that is language added by the

2   University of Michigan on its own initiative that we don't

3   believe is correct in this case or we don't have any reason to

4   believe it's correct.  Perhaps the University of Michigan knows

5   another way in which plaintiff Yang has violated her

6   nonimmigrant student status, but --

7        THE COURT:  Well, we don't know, but I understand

8   your point.

9        MR. TOOMEY:  We do not.  The Department of Homeland

10   Security did not ask the University of Michigan to add this

11   language.  The Department of Homeland Security, you know,

12   plaintiffs referred to the chaos created by this e-mail.  The

13   University of Michigan is not a defendant here.  We don't

14   support that statement by the University of Michigan based on

15   the record before us and so to the extent that --

16        THE COURT:  All right.  Let me ask you a question.

17   This is what I wanted to get to when I interrupted and I talked

18   to your adversary about this briefly and I'm very interested in

19   light of what you just said what your analysis is.  Don't you

20   think that in addition to the removal issue, that losing the

21   opportunity to go to classes, transfer out of a program, stop

22   studying or being barred from campus, I don't know if anything,

23   any of those things are happening, but that would seem to me to

24   risk irreparable harm to these individuals.  How would you

25   analyze that?

1          MR. TOOMEY:  Two ways.  First, your Honor, since we

2    don't have any reason to believe that they have lost their

3    nonimmigrant student status, we don't have any reason to

4    believe that they can't complete their course of study.  If

5    their studies are being interrupted by the universities,

6    that's -- the universities are not defendants.  We are not

7    asking the universities to interrupt their studies.  I believe

8    that our position that is that if under a prudential revocation

9    such as we have in this case, they're allowed to complete their

10   course of study until they leave and seek another visa.  So to

11   the extent that there is any problem with their school or their

12   employment, that seems to be a plaintiff between the plaintiffs

13   and a non-party university or two non-party universities.

14          Again, the Department of Homeland Security did not

15   ask the University of Michigan or Wayne State to dis-enroll

16   these students or to terminate their employment.  It terminated

17   their SEVIS record which is a recordkeeping function for the

18   Department of Homeland Security itself which would likely just

19   be placed in the system to make sure that they are confronted

20   with this information, the criminal history information when

21   they reapply for a visa.

22          THE COURT:  Okay.

23          MR. TOOMEY:  There is another problem with, so

24   similar to the problem with the fact that some of the

25   difficulties for plaintiffs are being caused by their

1  universities and not by the government is that when we get to

2  the likelihood of success on the merits, there is a Department

3  of State sized hole in their claims in this case.  Plaintiffs

4  did not name the Department of State as a defendant.  They do

5  not challenge the Department of State's revocation of their

6  visas, prudential or otherwise.  The SEVIS record termination

7  for all four plaintiffs were done at the behest of the

8  Department of State so on the consideration of likelihood on

9  the merits, it is unlikely that this Court's going to be able

10  to enter an order dictating that a non-party change its

11  position with respect to the SEVIS records and the reason that

12  the --

13         THE COURT:  I agree with that.

14         MR. TOOMEY:  The reason that the plaintiffs did not

15  add the Department of State is because the Department of

16  State's decisions are discretionary and they are unreviewable

17  and so what they're doing is trying to collateral attack the

18  Department of State's decisions by basing their claim on the

19  change to a SEVIS record which of course was, the only decision

20  made about the SEVIS record was made by the Department of

21  State, a non-party.

22         THE COURT:  Couple of other things and then you can

23  wrap up if you're ready.  The case out of the District of New

24  Hampshire appears to be very similar if not identical.  Are you

25  able to distinguish that or what did the judge there do wrong?

1      MR. TOOMEY:  I know very little about the other cases

2  of a similar nature being filed around the country.  I do know

3  that many of the TROs being entered are being done without full

4  briefing, without argument, without a record and I think that

5  some of them are being done in violation of what a TRO is

6  supposed to be.  They're upsetting the status quo and they're

7  reacting more to media reports than the record presented to the

8  court.

9      THE COURT:  Okay.  Are you able to say with some

10  confidence to the Court at this time whether or not any of the

11  plaintiffs will have removal proceedings initiated or be

12  arrested or any of that type of thing in the next 30 days?

13      MR. TOOMEY:  I can say that as of yesterday right

14  before the briefing deadline in this case, Department of

15  Homeland Security verified to me that they had -- that they

16  possessed no information indicating that any of the plaintiffs

17  are removable.  Now that can change.  If they drop out of

18  school tomorrow, they will become removable, but we don't

19  know -- we're not in control of that and we don't know whether

20  it's going to happen, but I can say that based on what's in

21  front of us known to DHS, they do not know of any grounds for

22  removability for any of the plaintiffs at this time.

23      THE COURT:  Interesting.  What if Michigan

24  de-enrolled or disenrolled a student, would they then be

25  removable?

1        MR. TOOMEY:  That would be a problem because a

2   condition of their nonimmigrant student visa is that they

3   maintain their enrollment.

4        THE COURT:  Yeah.

5        MR. TOOMEY:  Now it may be out of their control and

6   so maybe there's an exception for that.  I don't know all of

7   the exceptions of 214.2(f), and I'm not going to opine on it

8   and the Department of Homeland Security doesn't know anything

9   about it and so I don't think, you know, the burden is on

10  plaintiffs.  Plaintiffs need to submit evidence to this Court

11  meeting the extremely high burden for a TRO showing that a

12  removal is imminently likely and will cause irreparable harm

13  and they cannot do this on this record when the Department of

14  Homeland Security at this moment has no information indicating

15  that the plaintiffs are removal believe.

16       THE COURT:  So what if I entered a nice, simple order

17  and I said okay here's the schedule for your preliminary

18  injunction briefs, exhibits, we're going set a hearing with

19  testimony if necessary on X, Y and Z dates, in the meantime

20  government no arrests or removal proceedings against these four

21  people during that time.  What would you say about that?

22       MR. TOOMEY:  I think the portion of the opinion

23  relating to no arrests and no removal proceedings would be an

24  advisory opinion and lack jurisdiction because there is no --

25  again, plaintiffs bear the burden of presenting you, your

1   Honor, with evidence here today that they are imminently likely

2   to be arrested or placed into removal proceedings.  They cannot

3   meet that burden on this record.

4           THE COURT:  Seems like you knew I was going to ask

5   you that question, Mr. Toomey.

6           MR. TOOMEY:  Top of my head, your Honor.

7           THE COURT:  All right.  Anything else you'd like to

8   say?

9           MR. TOOMEY:  No, your Honor.

10          THE COURT:  All right, thank you for your time and

11   hard work.  We really appreciate it.  Okay Mr. Wadood, you have

12   last word.  You know where I'm at I think from my questions and

13   I'd be happy to hear any rebuttal argument at this time.  Go

14   right ahead.

15          MR. WADOOD:  Thank you, your Honor.  I want to point

16   out two things.  One is the bulk of defendants' argument about

17   this distinction between a SEVIS record and an F-1 status.

18          THE COURT:  Yes.

19          MR. WADOOD:  But this distinction, it's essentially a

20   distinction without a difference.  The SEVIS database is the

21   database that tracks F-1 status of every F-1 student in the

22   United States.  It's the only way that universities know who is

23   in status, who is out of status and it's kind of the exchange,

24   the communication exchange that ICE has with schools about who

25   is in status and so when someone's status is terminated,

1  obviously the database is reflected or updated to reflect that,

2  but there's no secret second status that students have where

3  they are F-1 students and they have a SEVIS record.  The SEVIS

4  record is the reflection of their status and these termination

5  reasons for example that defendants point to, those reasons

6  incorporate the status regulations, how you failed -- how you

7  failed to maintain status and how the agency can terminate

8  status.  Those reasons that the government is saying that you

9  can terminate a SEVIS record are the reasons for losing F-1

10  status and so and that reflects reality.  I mean, the harms

11  that come from losing status are flowing from this notification

12  that their status as reflected in SEVIS has been terminated.

13  They can't work.  They don't know if they can go to class.

14  They don't know if they can apply for any programs.  They might

15  be removable at any point and this is not just plaintiffs'

16  argument, this is something that at least three, probably four

17  federal district courts, the District of New Hampshire, the

18  Eastern District of New York, the --

19          THE COURT:  I must say you filed last night at, it

20  was late.  I didn't get a really good opportunity to look

21  through those cases --

22          MR. WADOOD:  I apologize --

23          THE COURT:  No, no, it's not your fault.  I

24  understand.  I just didn't have time, but apparently eastern

25  New York and another --

1          MR. WADOOD:  The District of Massachusetts and also

2     now the District of Columbia and this was after the government

3     was offered the chance to respond.  In all of these cases the

4     government as least orally was able to respond and at least in

5     the case of the District of Columbia provided written briefing

6     and after that briefing making similar arguments about SEVIS

7     versus status, the courts in those cases issued TROs covering

8     the exact relief we're seeking here which is a restoration of

9     their F-1 status and a prevention from arrest, detention and

10    the initiating of removal proceedings and this is also what the

11    Third Circuit in the Jie Fang case was dealing with where

12    students again and I quoted the language for you that the

13    student's SEVIS record was terminated which means they no

14    longer had F-1 status and as a result of that SEVIS record

15    termination, that status termination, they were put into

16    removal proceedings and that's exactly what plaintiffs are

17    afraid of at this point is that any day they could be issued a

18    notice to appear, they could be arrested by ICE and put into

19    removal proceedings all while they're trying figure out what's

20    going on with their status and so the fear is very real for

21    plaintiffs because of the few examples we have of this

22    happening in the past, those examples have led to removal

23    proceedings for folks who have otherwise maintained their F-1

24    status.

25          THE COURT:  Okay.  Last thing.  I don't know if this

1    makes a difference at this stage of the inquiry for what I need

2    to look at, but I do wonder are your clients able to fight this

3    battle on the agency level?  In other words are they able to

4    take issue with the information they've received from their

5    universities with the agencies?  Do they need to seek, umm,

6    what do they call it, re, umm --

7         MR. WADOOD:  Reinstatement.

8         THE COURT:  -- reinstatement or any of that sort of

9    thing?

10        MR. WADOOD:  No, there's no direct way to review,

11   challenge, appeal the termination of their F-1 status in this

12   case.  They can go to a different subagency, U.S.C.I.S., ask

13   for reinstatement which is a months-long process typically, but

14   as far as ICE's decision to terminate, DHS's decision to

15   terminate the F-1 status, that is not -- there's no

16   administrative process for appealing that directly and removal

17   proceedings haven't yet been initiated, they could be at any

18   time, they haven't yet been initiated and so there's no way to

19   challenge the termination in immigration court.  There's a

20   question as to whether that's even possible in immigration

21   court, but students are currently left with no recourse as far

22   as appealing to a superior agency of the termination of their

23   status which is why this is a final agency action which is why

24   the Third Circuit felt that it was a final agency action under

25   the APA and that also speaks to nature of the TRO.  The reason

1   for a TRO and I know defendants keep pointing to status quo,

2   there's always a disagreement as to whether and when the status

3   quo began, was it when the lawsuit was filed, was it before the

4   government took their action?  Luckily the Sixth Circuit has

5   already settled this dispute in United Foods v. Southwest Ohio

6   Regional Transit Authority and they say that status quo while

7   it's a helpful terminology, what really matters is the

8   traditional factors for issuing a TRO or a preliminary

9   injunction which is a balance of the equities and what's

10  happening here, especially because they cannot directly appeal

11  this termination, is irreparable injury in the form of the

12  impacts on their work, their class, their ability to go to new

13  programs, their potential of removal proceedings and that's

14  what we're asking for here is a temporary restraining order

15  allowing them to go back to work, back to class, preventing

16  removal proceedings, cutting this irreparable injury short so

17  that plaintiffs and this Court have the luxury and the freedom

18  to fully consider these important issues.

19          THE COURT:  Understood.  All right, very good.  Thank

20  you very much again, Mr. Wadood.  I must say that the arguments

21  of counsel were extremely helpful to the Court, skillfully and

22  very persuasively presented which we are always lucky to have

23  and thankful for.

24          I'm going to have to take the motion under

25  advisement.  I realize the emergency nature of things and the

1    clock is ticking and I'll get something out quickly, but in the

2    meantime we will recess momentarily with this matter under

3    advisement and thank you all once again for your hard work.

4    Okay.

5              THE CLERK OF THE COURT:  All rise.  The Court is now

6    in recess.

7              (Hearing concluded at 10:59 a.m.)

8                         --     ---     --

1                    C E R T I F I C A T E

7               I, David B. Yarbrough, Official Court

8  Reporter, do hereby certify that the foregoing pages

9  comprise a true and accurate transcript of the

10  proceedings taken by me in this matter on Tuesday, April

11  15th, 2025.

16  4/15/2025            /s/ David B. Yarbrough

17  Date                 David B. Yarbrough,
                       (CSR, RPR, FCRR, RMR)

18                   231 W. Lafayette Blvd.
                     Detroit, MI  48226